IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 19, 2016

**FELTON JACKSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Wilson County**
**No. 2009-CR-416   Brody Kane, Judge**

_____

**No. M2016-00490-CCA-R3-PC – Filed May 15, 2017**
_____

The Petitioner, Felton Jackson, filed a petition in the Wilson County Criminal Court, seeking post-conviction relief from his conviction of especially aggravated robbery.  The Petitioner alleged that his trial counsel was ineffective by failing to call alibi witnesses, coercing the Petitioner not to testify, and failing to investigate or present proof regarding the Petitioner's "social, medical and mental health."  The post-conviction court denied relief, and the Petitioner appealed.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Donna G. Wagner, Mt. Juliet, Tennessee, for the Appellant, Felton Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Howard L. Chambers, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On direct appeal, this court summarized the facts adduced at trial as follows:

> Officer [Joshua] Lewis testified that he was an officer with the City of Lebanon Police Department.  He and a fellow officer were dispatched to the Plaza Motel on December 23, 2008, at approximately 4:45 a.m., to respond to a 9-1-1 call.

When they arrived, they were unable to enter the victim's room, so they obtained a master key from hotel personnel. Upon entering the room, Officer Lewis observed that the room "was in shambles." Personal belongings were strewn about the room, and the mattress had been removed from the bed and was lying in front of the doorway. He and Officer Stone began to "clear" the room to ensure that the room was safe before allowing emergency personnel to enter the room, during which time Officer Lewis saw the victim lying on the box springs of the bed. He testified that there was "blood everywhere," including the floor, the mattress, the box springs, the ceiling, and the walls. After notifying medical personnel that the room was "clear," Officer Lewis approached the victim and asked him what had happened. The victim stated that "he was laying [sic] in bed . . . [and] . . . awaken[ed] to a big black guy beating him with a pipe." Officer Lewis assisted emergency personnel in loading the victim into the ambulance and secured the room.

On cross-examination, Officer Lewis confirmed that the victim's hotel room door was locked when they arrived and that he did not observe any signs of forced entry. He stated that the victim was conscious but lying on the box springs of the bed, covered in blood.

. . . .

. . . Officer Lewis, . . . clarified that the victim actually made two statements to him. One statement occurred in the hotel room during the initial contact. After Officer Lewis had secured the room and the victim was in the ambulance, Officer Lewis approached the victim and inquired as to the identity of the assailant. During that statement, the victim indicated that the black male "lived down the way." Officer Lewis recognized the seriousness of the victim's injuries and attempted to gather additional information, including perhaps a dying declaration, before the victim was transported. . . .

. . . .

The next witness was John Wayne Engle, who lived in close proximity to the Plaza Motel. On the morning of

December 23, 2008, he was walking his dog between 6:00 and 6:30 a.m. when he discovered checkbooks lying on the ground between his residence and the residence next door to him. He noticed several police officers in the vicinity and turned the checkbooks in to an officer.

Officer Matthew Dedman, an officer with the City of Lebanon Police Department, testified that he was working on December 23, 2008. His responsibility that day was to secure the crime scene van. When he was on duty, someone approached him and handed him some checkbooks. He turned the checkbooks over to Detective Massey.

The State next called Shirley Bogle, who resided in the Plaza Trailer Park, which was located directly behind the Plaza Motel. She testified that she placed a 9-1-1 call around 4:30 a.m. on December 23, 2008. The call was precipitated by [the Petitioner's] arguing with a pregnant female. Ms. Bogle asked [the Petitioner] and the female to move because they were standing very close to her dog, who was chained, and she feared that the dog might bite one of them. She observed [the Petitioner] holding what appeared to be an umbrella and something "hanging[,] like a purse or something. . . ." Ms. Bogle indicated that she called 9-1-1 because [the Petitioner] and the female were in a "fight or a fuss," and because the female was pregnant, Ms. Bogle was concerned that [the Petitioner] might harm her. In her call, she asked the police to patrol the area; she did not ask them to investigate or take any other action. She identified [the Petitioner] in court.

On cross-examination, Ms. Bogle stated she was positive that the female was pregnant because she had seen her previously but did not know her personally. She acknowledged that what she thought was an umbrella could have been a flashlight. She confirmed that [the Petitioner] lived in the same community, and she pointed out his residence on a map.

The State's next witness was Tabitha Donnelly. She pleaded guilty to criminal charges arising from this incident and received a sentence of fifteen years, to be served at 100%

release eligibility. On the day in question, she had borrowed the victim's Jeep. Around 4:00 a.m., she was visiting an acquaintance and "was getting high" when [the Petitioner] knocked on the back door. The owner of the home instructed Ms. Donnelly to open the door for him. Once inside, [the Petitioner] asked Ms. Donnelly what she was about to do, and she told him that she was going to return the victim's Jeep. [The Petitioner] asked Ms. Donnelly if the victim usually had money in his possession, and she responded affirmatively. She asked [the Petitioner], "Why, do you want to rob him? Don't hurt him, just scare him." [The Petitioner] responded, "S**t, it's Christmastime. I ain't got no more dope. My pockets is [sic] empty. I'm down with whatever."

Ms. Donnelly and [the Petitioner] then left, and she drove [the Petitioner] to the Plaza Motel at the entrance of the parking lot. She continued through the parking lot and parked outside of the victim's room. She entered the victim's room and sat down in a chair. The victim asked Ms. Donnelly if she had locked the Jeep. She answered that she had not, and she walked outside to do so. At that point, [the Petitioner] walked into the room. [The Petitioner] approached the victim, who was in bed, and asked for all of his money. Ms. Donnelly opined that the victim was aware of [the Petitioner's] intentions and leaned back so that he could kick [the Petitioner], but [the Petitioner] produced a steering wheel lock and struck the victim.

Ms. Donnelly stated that she stood in the doorway in shock, saying, "Please quit hitting him." [The Petitioner] did not stop the attack. As the victim and [the Petitioner] fought, [the Petitioner] pulled the victim's foot and dragged the victim and the mattress upon which he was lying onto the floor. [The Petitioner] ordered Ms. Donnelly to take the victim's money, so she stepped across the mattress and box springs to look for his wallet, which she assumed was under the bed. When she found nothing there, Ms. Donnelly fled from the room followed by [the Petitioner]. She noted that when [the Petitioner] left, he had taken the victim's wallet, some checkbooks, a bowl of coins, and the weapon he used in the attack. They ran into the Plaza Trailer Park. They stopped in front of a trailer where a pit bull was chained

outside. They began to argue, and the owner of the trailer, a female, came outside and asked them to move away from her trailer. Ms. Donnelly was arrested ten minutes later. Later that day, Detective Massey interviewed her, and she gave a statement recounting the events. Ms. Donnelly identified [the Petitioner] at trial.

On cross-examination, Ms. Donnelly admitted that the victim was "a trick" to her, meaning that she would "do things . . . for money." She acknowledged that she was not pregnant on the date in question. She further admitted that her intention was to assist [the Petitioner] in robbing the victim but not hurting him. Ms. Donnelly stated that she did not touch the steering wheel lock but that [the Petitioner] must have retrieved it from the victim's Jeep.

Ms. Donnelly agreed that she had the victim's blood on her shoes and a "splatter of blood" on her pants when she was arrested. She confirmed that she stayed in the victim's room on the inside of the door during the attack, that she entered the room briefly in an attempt to retrieve the victim's wallet, and that she never touched the victim. She did not remove any of the victim's belongings. Ms. Donnelly stated that after her interview with Detective Massey, he drove her to the Plaza Trailer Park to assist him in retrieving the weapon. Although she believed she knew where the weapon was located, they were unsuccessful in recovering it.

Ms. Donnelly identified a photograph of an item that bore the word "club" on it. She did not recall having seen the item in the victim's Jeep or touching the item while she was in the Jeep. She admitted having received narcotics from [the Petitioner] on occasion. Had she received any proceeds from the robbery of the victim, she intended to use the money "to get high."

The State called the victim as its next witness. He was sixty-three years old at the time of trial. At the time of the incident, he had resided at the Plaza Inn Motel for eight to ten years. The victim testified that he suffered injuries to his skull and a finger as a result of the attack on him. However, he did not recall how the attack occurred and did not

remember anything about the events of the day in question. His first memory thereafter was waking up in the rehabilitation area of Vanderbilt Hospital. He did not know who attacked him. The victim did not remember Tabitha Donnelly, either.

The State's next witness was Detective Scott Massey with the Lebanon Police Department. He responded to the Plaza Motel around 5:30 a.m. on December 23, 2008. When he arrived, Officers Lewis and Stone were on the scene, and the ambulance was en route to the hospital. When Detective Massey saw the size of the room, he requested assistance from the Crime Scene Team because it was larger than he could process by himself. He recalled receiving the victim's checkbooks from Officer Dedman. He left the motel around 7:00 a.m. to return to the police department. He developed an idea, based on items he observed in the hotel room, that a female had been there, so he checked to see if any female with whom law enforcement was familiar had been arrested. He learned that Tabitha Donnelly had, in fact, been arrested that morning in close proximity to the crime scene. He asked that Ms. Donnelly be brought from the jail so he could speak with her and also requested to examine the clothing she had been wearing. He noticed blood on Ms. Donnelly's shoes and also noted that Ms. Donnelly had been wearing a very large, dark-colored "hoodie" style sweatshirt and sweat pants. He forwarded Ms. Donelly's clothing to the crime laboratory. Ms. Donnelly gave Detective Massey a statement implicating [the Petitioner] then accompanied him to the hotel around 9:30 or 9:40 a.m. on December 23 to direct officers to the assault weapon. However, their attempt to locate the weapon was unsuccessful.

Through the course of the investigation, Detective Massey learned where [the Petitioner] resided. He returned to the trailer park during the morning of December 23 and knocked on the door. [The Petitioner] opened it, turned around, and walked to the sofa, where he sat down. He looked as though he had been asleep. He was wearing boxer shorts and had a piece of toilet paper inside his nose with dried blood on it. [The Petitioner] explained that he was trying to stop a nose bleed. From the door, Detective Massey

asked [the Petitioner] what time he arrived at his home the previous night. [The Petitioner] responded that he had been at home all night. Detective Massey requested that [the Petitioner] get dressed and accompany him to the police department.

Later in the day, Detective Massey obtained a search warrant for [the Petitioner's] trailer. He also requested assistance from the Crime Scene Team in searching the area surrounding [the Petitioner's] trailer. During that search, Detective Massey noticed that the underpinning of a neighboring trailer had been pulled back. He looked under the trailer and observed a bed sheet located approximately in the middle of the area under the trailer. He crawled into the space and pulled the sheet back, revealing a towel and the club that had been described by Ms. Donnelly as the weapon used by [the Petitioner]. Detective Massey later found the other half of the club's mechanism behind the passenger seat of the victim's Jeep.

On cross-examination, Detective Massey stated that as part of the investigation, he obtained buccal swabs from the victim, Ms. Donnelly, and [the Petitioner]. At trial, he identified photographs of shoe prints that were left on the victim's mattress and on a piece of paper. He also testified that witnesses whom they interviewed indicated that a pregnant female and a white male had attempted to "jimmy" the lock of the victim's door a few days prior to the assault. The witnesses indicated that the female they had previously seen was not Ms. Donnelly, saying, "[N]o, its not the pregnant female that we seen [sic] tonight. It's a different girl."

Detective Massey discussed another case in the area involving Ms. Donnelly but stated that she was not a suspect in the case. Rather, she was with the victim at the time when a slightly-built black male entered that victim's home and tried to steal his wallet. Detective Massey confirmed that no identifiable latent fingerprints were obtained from the crime scene. He also acknowledged that no physical evidence from the crime scene implicated [the Petitioner] and that the search of [the Petitioner's] trailer rendered no incriminating

evidence. [The Petitioner] declined to make a statement to Detective Massey.

Dr. Jarod McKinney testified that he was a professor of emergency medicine at Vanderbilt University and that he also worked in the emergency department of Vanderbilt Hospital. The trial court accepted Dr. McKinney as an expert in the field of medicine. Dr. McKinney treated the victim when he was admitted into the emergency department. The victim suffered multiple skull fractures, facial fractures, and intracranial bleeding. He described the intracranial bleeding as being potentially life-threatening. He stated that it would have taken four to six weeks for [the victim's] fractures to heal. Although [the victim] presented in a conscious state, he experienced a seizure after the CAT scan and awakened later.

Special Agent Forensic Scientist Mark Dunlap with the Tennessee Bureau of Investigation next testified as an expert in the fields of serology and DNA analysis. He testified that exhibit 22, which contained the bed sheet, towel, and club, contained the victim's DNA. A blood stain on Ms. Donnelly's sweatshirt could not be tested further for DNA because the blood was likely transferred there by being packaged together with the sweat pants. The blood stain on her pants contained DNA from the victim as the major contributor. Some of the areas indicated that Ms. Donnelly was the minor contributor, but other stains contained DNA from a minor contributor that was insufficient for further testing. Special Agent Dunlap obtained the victim's DNA from Ms. Donnelly's shoes. The victim's checkbooks were tested and contained DNA from the victim as a minor contributor and from [the Petitioner] as a major contributor. No DNA was obtained from blood stains on the doorframe of the victim's room, the scrapings from [the Petitioner] fingernails, or blood stains around the victim's bathroom. A knife found in the victim's room tested positive for the presence of his own DNA.

State v. Felton Neville Jackson, No. M2012-00828-CCA-R3-CD, 2013 WL 5675466, at *1-6 (Tenn. Crim. App. at Nashville, Oct. 17, 2013) (footnote omitted).

At the conclusion of the trial, the Petitioner was convicted of especially aggravated robbery, for which he received a sentence of twenty-five years, and aggravated assault, for which he received a sentence of six years. Id. at *1. The trial court ordered the sentences to be served concurrently. Id. On appeal, this court affirmed the convictions but remanded the case to the trial court for entry of a judgment reflecting that the aggravated assault conviction merged into the especially aggravated robbery conviction. Id.

Thereafter, the Petitioner, acting pro se, filed a petition for post-conviction relief and an amended petition for post-conviction relief. Counsel was appointed and filed an amended petition for post-conviction relief. The petitions alleged, in pertinent part, that the Petitioner's trial counsel was ineffective by failing to call alibi witnesses, coercing the Petitioner not to testify, and failing to investigate or present proof regarding the Petitioner's "social, medical and mental health."

At the post-conviction hearing, the Petitioner testified that trial counsel should have subpoenaed his mother and his wife to testify as alibi witnesses.[1] The Petitioner said that he told trial counsel each of the women would testify that he was at home at the time the victim was attacked. Trial counsel told the Petitioner that the women should not testify but did not explain his reasoning.

The Petitioner said that he was in jail from December 23, 2008, to September 2009 when he was released on bond. Trial counsel visited the Petitioner in jail "two or three times every other month," and they met once or twice a month after the Petitioner was released. During the meetings, the Petitioner and trial counsel discussed the case. Nevertheless, the Petitioner thought trial counsel did not spend enough time with the Petitioner to prepare for trial. When the Petitioner told trial counsel that he wanted to see trial counsel more frequently, trial counsel responded that he would try but that he had other cases.

The Petitioner said that he "somewhat" understood that he could either go to trial or plead guilty. As the trial date approached, the Petitioner and trial counsel began to discuss trial strategy. The Petitioner did not feel that he understood what was happening with his case, but he acknowledged that he knew what the trial "process looked like, who would testify, who the witnesses would be, [and] what the evidence would be."

The Petitioner said that during Ms. Bogle's testimony, he became concerned about her credibility. The Petitioner told trial counsel about his concerns, but trial counsel did not cross-examine Ms. Bogle adequately. Although the Petitioner asked trial counsel to question the DNA expert about "how the DNA was presented on the checkbook," trial

---

[1] The Petitioner and his wife were married after his trial.

counsel did not pursue that line of questioning. The Petitioner noted that the police had taken one sample of his DNA on the day he was arrested and had taken another sample three or four months later. After the second DNA sample was taken, the Petitioner's DNA was found on the victim's checkbook. The Petitioner asked trial counsel to investigate why the DNA was not discovered until after the second DNA sample was taken, but counsel never investigated.

The Petitioner said that trial counsel advised him not to testify at trial. The Petitioner did not understand that he could have insisted upon testifying; therefore, he followed trial counsel's advice.

The Petitioner said that he had a history of mental illness but that he did not have a mental evaluation prior to trial. He explained that in 2001, he was diagnosed with depression and stayed in a mental institution for approximately one month. While in jail, the Petitioner saw a psychiatrist each month. Prior to and during trial, the Petitioner was taking medication for depression. The Petitioner was still on medication at the time of the post-conviction hearing. Additionally, he was diagnosed with bipolar disorder and anxiety, for which he took medication.

The Petitioner said that trial counsel did not hire an investigator and that no one was interviewed about the Petitioner's upbringing or social history. The Petitioner thought that his mental illness might have affected his "state of mind during all this time."

On cross-examination, the Petitioner said that he did not recall the trial court's advising him of his right to testify. The Petitioner said that he went to jail on December 23, 2008, and that he was required to submit the first DNA sample in order to be released on bond. While on bond, the Petitioner failed to appear for a court date; therefore, he was returned to jail to await his trial, which occurred in 2011. The Petitioner agreed to give a second DNA sample three to four months after he agreed to give the first sample.

The Petitioner acknowledged that trial counsel did not threaten him or coerce him not to testify; counsel merely advised him against testifying. The Petitioner said that he would have testified that he was at home at the time of the offense. The Petitioner said that he had been playing basketball earlier that night and denied handing his wife bloody clothes to wash.

The Petitioner said that he had been depressed since 2001. He agreed that his depression did not make him incompetent to testify. The Petitioner did not know that trial counsel had filed an alibi notice prior to trial.

The Petitioner said that after Ms. Donnelly testified that she was not pregnant at the time of the offense, he asked trial counsel "to get Shirley Bogle back on the stand." He explained that he wanted trial counsel "to get [Ms. Bogle] to where she said [the Petitioner] was arguing with a pregnant woman. And at the time, the only woman that was pregnant was [the Petitioner's] wife."

The Petitioner said that he also requested that trial counsel ask the DNA expert if he could determine how the Petitioner's DNA got on the checkbook. The Petitioner thought questioning Ms. Bogle and the DNA expert might have made a difference in the jury's verdict.

Trial counsel testified that he began representing the Petitioner shortly after his arrest. Initially, trial counsel and the Petitioner met several times a week at the jail; thereafter, they began meeting once or twice a month.

Trial counsel said the possibility that one of the DNA samples the Petitioner gave "could have been used to transfer DNA to an item to be used at a later date" was a "substantial" issue. Trial counsel said that he was prepared to cross-examine the TBI's expert witness and that the cross-examination "was pretty extensive." Trial counsel did not, however, have any evidence that the DNA samples were used to put the Petitioner's DNA on the checkbook.

Trial counsel acknowledged that he knew the Petitioner's mother and wife were potential alibi witnesses. When trial counsel interviewed the Petitioner's mother, she indicated that the Petitioner was in the house when she went to bed and was there when she woke the next morning. She stated, however, that "she thought he'd gone out somewhere in the middle of the night and didn't know when he had returned." The Petitioner's wife said that when the Petitioner came into the house, he handed his clothes to her and told her to wash them. Trial counsel decided not to call the women as witnesses. Trial counsel noted that if the Petitioner's wife, who "was the mother of his multiple children," had testified, it "could have caused legal problems for" her.

Trial counsel said that during trial preparation, the Petitioner never asked to testify and that the Petitioner's testifying was never considered to be an option. Trial counsel said that he had represented the Petitioner in the past and knew that the Petitioner had "a couple of things on his previous record" that could be used for impeachment if he testified. Trial counsel also said that the Petitioner "had made certain disclosures that would prevent me from ethically putting him on the stand to testify that he wasn't there." Trial counsel said that the trial court advised the Petitioner of his right to testify.

Trial counsel said that he did not observe anything that raised concerns about the Petitioner's mental health or made him think the Petitioner should be evaluated. The

Petitioner always responded appropriately to trial counsel's questions. Trial counsel opined that he represented the Petitioner well at trial and at sentencing and that he could think of nothing he could have done to change the outcome.

On cross-examination, trial counsel maintained that he would not have refused to let the Petitioner testify but that he advised the Petitioner not to testify. Trial counsel said that he "believe[d] it [was] still correct advice. [The Petitioner] should not have taken the stand to testify on his behalf."

Trial counsel said that he reviewed the discovery materials with the Petitioner. Trial counsel was confident that the Petitioner "fully understood the pros and cons of this case, the evidence against him, the counter theories, the whole nine yards." Trial counsel stated that they discussed the case "in explicit detail because there were several different factors that came up that could have been used as potential arguments at trial, and were raised in our defense of the case."

Trial counsel said that the Petitioner was aware of his mother's and wife's statements to counsel regarding the Petitioner's actions on the night of the offense, namely that he left the house and that he handed his wife bloody clothes to wash when he returned. Trial counsel explained to the Petitioner why having the women testify was "risky." Trial counsel said that he and the Petitioner never discussed the Petitioner's mental health and that the first time he heard of any potential mental health problems was during the post-conviction hearing. Trial counsel did not think anything about the Petitioner's mental health history would have helped the Petitioner at trial or sentencing.

The post-conviction court denied relief, finding that the Petitioner had failed to establish that counsel was ineffective. On appeal, the Petitioner challenges the ruling of the trial court.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against

those findings.  See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct.  See Fields, 40 S.W.3d at 458.  However, we will review the post-conviction court's conclusions of law purely de novo.  Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner contends that trial counsel was ineffective by failing to call the Petitioner's wife and mother who would testify that he was at home on the night of the offense.  However, the post-conviction court accredited trial counsel's testimony that he told the Petitioner his mother would have testified that he left the house during the night and that his wife would have testified that he handed her bloody clothes to wash.  Specifically, the post-conviction court found that trial counsel's testimony was "a more reasonable, credible and believable explanation as to why the two witnesses were not called to support an alibi defense."  Moreover, the Petitioner failed to call the witnesses to testify at the post-conviction hearing.  Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."  Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).  We may not speculate on what benefit the witnesses might have offered to the Petitioner's case.  Id.  Accordingly, the

- 13 -

Petitioner has failed to demonstrate prejudice in this regard.

The Petitioner further contends that he was coerced by trial counsel not to testify at trial. The post-conviction court noted that the trial court advised the Petitioner of his right to testify. The Petitioner acknowledged that he made the choice not to testify upon the advice of counsel.

Finally, the Petitioner contends that trial counsel was ineffective by failing to investigate the Petitioner's social, medical, and mental health history and to present proof that he was "suffering from a mental or physical condition that reduced his culpability." The post-conviction court found that the Petitioner did not inform trial counsel about any potential mental health issues. Moreover, trial counsel testified that he did not observe anything concerning about the Petitioner's mental or physical health. Further, the Petitioner did not testify that any of his mental or physical conditions affected the outcome and did not have an expert witness to testify at the post-conviction hearing regarding his mental health.

In sum, the post-conviction court ruled that the Petitioner failed to prove that trial counsel was ineffective. Based upon the foregoing, we agree with the post-conviction court and conclude that the Petitioner is not entitled to relief.

### III.  Conclusion

Finding no error, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 14 -